UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | Criminal No. 23-CR-383 (JDB) |
| ) | |
| CHARLES DAWSON, ) | |
| ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing in the above-referenced case. For the reasons set forth below, the government recommends a sentence of 24 months of incarceration, followed by ten years of supervised release.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.   Victim A.K.**

On December 27, 2018, members of the Prince George's County Police Department Vice and Sex Trafficking Unit ("VSTU") conducted an undercover prostitution operation at the Motel 6 located at 75 Hampton Park Boulevard in Capitol Heights, Maryland. During the course of this operation, members of VSTU had arranged to solicit sex acts from a female at the Motel 6. The VSTU located the female at the Motel 6 and arrested her for a prostitution-related offense. She was identified as a seventeen-year-old minor, A.K., who had run away from her home in North Carolina. A.K. was approximately five months pregnant. An adult male (not the defendant), crack cocaine, and a crack pipe were also located in the hotel room.

Upon arrest, A.K. provided a statement to law enforcement. She advised that she worked for a pimp named "Chuck," whom she identified the next day as the defendant via a confirmation

photograph. She provided law enforcement with "Chuck's" phone number, which was linked to the defendant via subsequent legal process.

A.K. stated that the defendant did not know that she was seventeen, but rather thought that she did not have an ID. She recounted that she met the defendant in early December 2018 through a mutual female friend. The second or third time she saw the defendant in person, he asked her if she wanted to "be a team" and said that he could "help her out." The next day, A.K. called the defendant because she needed money. The defendant instructed her on how the "dates" would be handled. He also placed commercial sex advertisements of her on an escort site using photographs that he took of her, as well as photos from her Instagram account. These advertisements were located by law enforcement and they appeared to be advertising the minor for commercial sexual exploitation in Washington and Maryland from December 26 to December 27, 2018. The ads had the title "All-American beautiful White Girl" and "Lonely? Lemme give u a Christmas Present." The photos include nude photographs of A.K. The phone number listed in the ads was a TextNow number; law enforcement subsequently learned that the IP address used to set up the TextNow account was registered to the defendant's Oxon Hill, Maryland residence.

A.K. stated that the defendant set the prices for the "dates" that she was expected to work, and that he kept forty percent of the profits. She stated that the defendant used his phone to communicate with "Johns" and to schedule the dates for her. On the first day that A.K. worked for the defendant, he would leave the room upon the arrival of a "John" and watch until the "John" left. The defendant would then ask her for his portion of the proceeds from the commercial sex date. A.K. reported that she was high on narcotics when she worked for the defendant, but could not recall whether the defendant had provided her with the drugs.

A.K. was subsequently returned to her mother's custody in North Carolina. On December 31, 2018 – four days after the sting operation – the defendant messaged A.K. using his identified Instagram account, asking her "U ok. I haven't heard from u." A.K. informed the defendant that she had been arrested in a sting operation and returned to her mother in North Carolina. She further told him that she had been sober since the arrest and that she had to stay with her mother until she had her baby in May. Over the next few months, the defendant repeatedly attempted to persuade A.K. to come back to work for him in D.C. once she had her baby, claiming that he would make her rich and that they would be a "team." For example, on February 19, 2019, the defendant sent A.K. the following messages:

| | |
|---|---|
| DEFENDANT: | Come be down 4 my crown for real this time |
| A.K.: | I gotta wait til I have the baby<br>My mom's adopting it<br>But I'ma be back for sho |
| DEFENDANT: | Will u need to come back to me and let me show u how to really get to it |
| A.K.: | Bet |
| DEFENDANT: | Im serious |
| […] | |
| DEFENDANT: | Send me some pics |
| A.K.: | Of?<br>Recent?<br>I only have two |
| DEFENDANT: | Surprise me |
| A.K.: | [*Sends photos not included in warrant return provided to law enforcement*] |
| DEFENDANT: | A sexy pic |

On March 20, 2019, the defendant sent A.K. the following messages:

| | |
|---|---|
| DEFENDANT: | I got a nice place so when u ready come be a part of the team[1] |
| A.K.: | Sounds great I have four more weeks til I have my son |
| DEFENDANT: | Marvelous<br>I haven't forgot about u kno that…I miss u to be honest |
| A.K.: | Awh I miss u<br>Im glad I got my mind right tbh |
| DEFENDANT: | Me too…That's all I wanted you to do. U got so much potential<br>No reason u shouldn't be rich |
| A.K.: | I can see I just needed to fix my mental |
| DEFENDANT: | I was going to stick with you thru the bad times kno that. Im a real one.<br>Im still here. That should tell you something |
| A.K.: | I believe it most people would bailed on me when they found out the feds caught me<br>But I kept silent they ain't getting shit from me ion talk Latin |
| DEFENDANT: | Thats why i like you. You show me loyalty. I really want you to win with me |

Other messages sent by the defendant included statements such as "U should be hoin right now," "U my bitch just know that," and "I wish u was sober when u was with me." The defendant continued messaging A.K. through April 2019, when she stopped responding.

B.   **Victim J.C.**

In May 2020, law enforcement located and interviewed an adult female (hereinafter J.C.) who reported that the defendant had recruited her to work for him in commercial sex. J.C. advised that she met the defendant during the spring of 2019, while she was looking for a pimp to work

---

[1] Based on the timing of these messages, the "nice place" that the defendant says he "got" is J.C.'s apartment, which, according to J.C., he had moved into in March 2019.

with. J.C. stated that the defendant contacted her on Instagram and told her that "Ray Charles can see your potential." The defendant came to J.C.'s apartment in Washington, D.C. and discussed having her work for him in commercial sex. J.C. stated that she engaged in commercial sex acts for the defendant's benefit in Washington, D.C. and Maryland from approximately March 18, 2019—April 15, 2019. During this time, the defendant moved into J.C.'s apartment, located in Washington, D.C. J.C. was addicted to heroin and was using suboxone to wean herself off of the drug.

J.C. reported that she worked for the defendant by getting "dates" on the internet, engaging in sex acts on the Track[2] in Washington, D.C. and working in strip clubs and casinos. J.C. advised that the defendant posted her on commercial sex websites and that the commercial sex "dates" would either occur at her apartment in Washington, D.C., or the defendant would transport her from her apartment in Washington, D.C. to a hotel, including hotels in Maryland, and the dates would come to the hotel. J.C. stated that she also worked in commercial sex for the defendant in strip clubs in Prince George's County, Maryland, and casinos in the Washington, D.C. area, including the MGM National Harbor Casino in Oxon Hill, Maryland. Law enforcement located numerous Lyft receipts in the defendant's email showing trips between J.C.'s apartment, the Track, and the MGM casino in Maryland in March and April 2019. The defendant's email account also contained numerous email confirmations from "Megapersonals.com," a commercial sex website, showing that the defendant had posted advertisements of J.C. with the title "All-American Snow ❄" on a daily basis between March 19, 2019, and April 13, 2019.

---

[2] The "Track" is an area in Washington, D.C. spanning from L Street to O Street Northwest, and 7th Street to 16th Street Northwest. The Track is an area known to law enforcement for street prostitution.

J.C. stated that she was scared to work the Track in Washington, D.C., but the defendant told her that it was an "honor" for a woman to work the Track. The defendant instructed J.C. on how to work the Track, including how much to charge for commercial sex acts, where to walk to meet "dates," and what to do with the money she earned.

J.C. reported that the defendant took all of the money that she earned through commercial sex work. Within the defendant's email account, law enforcement located numerous emails from cash@square.com showing that J.C. had sent the defendant hundreds of dollars using Cash App between March 22, 2019, and April 6, 2019. In addition, J.C. advised that the defendant took her food stamp card, which held her TANF money.[3] J.C. stated that the defendant would promise her that he could help her gain custody of her child, but that he did not do so.

J.C. recounted that on one occasion, the defendant caught her messaging another pimp and became angry. The defendant grabbed J.C. around her throat and threatened to kill her if she tried to leave him. He threw her to the ground, kicked her in the ribs, and beat her legs and body. J.C. stated that the defendant purposefully avoided hitting her in the head so that she would not have any marks on her face.

J.C. continued to work for the defendant after he beat her. J.C. stated that she wanted to leave the defendant, but did not know how to do so because he was living in her apartment. J.C. also stated that she did not know how she would engage in commercial sex work on her own, and that she could not work for another pimp because the defendant took all of her money which meant that she could not pay "a choosing fee."[4] J.C. stated that she ultimately ran away from the defendant

---

[3] TANF (Temporary Assistance to Needy Families) provides cash assistance to families in need.

[4] A "choosing fee" is money paid by a commercial sex worker to a pimp in order to work for him.

after he got mad at her when she was on the Track and took her phone away from her, leaving her stranded.

**C.    O.H.**

Law enforcement also identified a third female whom the defendant exploited in commercial sex – O.H., an adult woman. The defendant began posting commercial sex ads of O.H. beginning on April 20, 2019. Law enforcement identified hundreds of ads posted of O.H. from the defendant's identified email account. In addition, a search of the defendant's cell phones revealed thousands of pages of texts between the defendant and O.H. in which he regularly discussed bringing her to the Track and the MGM casino, directed her where to go and what to do to get "dates," and discussed posting her on commercial sex websites. In the messages, O.H. consistently informed the defendant each time she had a date and told him how much money she was paid, and then sent him money after the date. Moreover, the defendant consistently referred to O.H. as his "hoe" and identified himself as her pimp. For example, on August 3, 2019, the defendant sent OH the following message:

DEFENDANT:       Also I apologize if ur feelings was hurt.. I was trying to do no bullshit to you. Im a Pimp. That going to have more than one girl and yes im going to have sex with them just like i do with you. They paying their money also. It dont matter what house hold u are in.. Pimps are goingto fuck their hoes... U worry when they are fucking on a girlfriend or wife

The defendant continued to exploit O.H. in commercial sex until the date of arrest.[5]

---

[5] O.H. spoke with law enforcement following the defendant's arrest and stated that she worked for herself and that the defendant did not make her participate in commercial sex. However, no ads for O.H. were posted following July 14, 2023, the day of the defendant's arrest – despite having previously been posted on a daily basis.

**D.    Social Media Activity**

The defendant regularly used Instagram to boast about his exploitation of women and to recruit more females to work for him, often using O.H. as an example of his success as a pimp. For example, he sent the following messages to various women whom he was attempting to recruit:

> DEFENDANT (September 7, 2021): Hell yeah… every time [O.H.] went in I bond her out and paid her lawyer but imma show u a better way then what u do
>
> DEFENDANT (April 20, 2021): Well I taught [O.H.] everything she know plus I told her I wanted you cause I saw ur potential… We really building over here…Well let me get that type of loyalty… I'm going to do something with it just like I did with [O.H.]
>
> DEFENDANT (July 21, 2020): [O.H.] came along way also… she been with me for a year n half…[O.H.] don't make money every night we just try again…Imagine what you the game will do when u choose a real one…Ask [O.H.] she is a witness…[O.H.] came with nothing and no she have so much.

The defendant also referenced using violence against women engaged in commercial sex work. For example, on February 12, 2019, the defendant sent the following messages to a woman whom he knew worked in commercial sex:

> DEFENDANT:    This bitch name honey
>
> ….
>
> DEFENDANT:    She was out of pocket and had my name in her mouth[6]

---

[6] 'Out of pocket' is a term for women who are perceived as out of line or not following a pimp's rules.

|  |  |
|---|---|
|  | I beat her ass lastnight too. I bet she won't speak like that no more. |
| [Other participant]: | She work for u? |
| DEFENDANT: | I dont even hit bitches but she got me fuck up |
|  | Yeah she was my ho for a few weeks but she went back to [*name of another trafficker known to law enforcement*] she in love |
| [Other participant]: | Haha I'm dead |
| DEFENDANT: | Yeah broke that bitch phone too |

Law enforcement also reviewed the public content of the defendant's Instagram account. The account showed numerous posts reflecting the defendant's commercial sex activities, including photos with known traffickers in the D.C. area, photos of the defendant posing on the Track, photos showing the defendant holding various 'pimp cups' and trophies, and captions referencing '304s' and 'the game.'[7]

## DISCUSSION AND RECOMMENDATION

### I. Generally Applicable Legal Principles

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the

---

[7] A 'pimp cup' is a bedazzled chalice viewed as a status symbol by individuals who exploit women in commercial sex. '304' is a term used to identify women engaged in commercial sex work, used because when spelled backwards, 304 looks like the word 'hoe.' 'The game' refers to commercial sex trafficking.

Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

### III. Government's Sentencing Recommendation

The defendant's Sentencing Guidelines range is 18-24 months of incarceration. The government recommends a sentence of 24 months of incarceration, to be followed by ten years of supervised release. This sentence recognizes the seriousness of the defendant's conduct and ensures that he will be monitored for a significant period of time upon his release.

## IV.     The § 3553(a) Factors Support a Sentence of 24 Months of Incarceration.

### A.     Nature and Circumstances of the Offense

The defendant has exploited vulnerable women in commercial sex for his own financial gain for years, only stopping because he was arrested. The defendant recruited a vulnerable seventeen-year-old to work for him in commercial sex with claims that he could "help her out" and they could "be a team." He then posted nude photos of her on commercial sex websites, selling her to various men until she was recovered by law enforcement in a hotel room with narcotics.[8] Even after she was arrested, the defendant attempted to recruit her to come back to work for him, despite knowing about her addiction and knowing that she was pregnant, promising her that he could make her rich. He similarly took advantage of J.C., who was also dealing with a drug addiction, and promised that he could help her improve her life. Instead, he moved into her home, took her food stamp card and identification, and kept the money that she earned from her commercial sex work. He also exploited O.H. for years, boasting about how she came to him "with nothing" and taking money that she earned in commercial sex.

The defendant is proud of his behavior. His messages show incessant boasts about his self-proclaimed status as a "pimp." He used his social media accounts to glamorize his behavior in order to recruit more women to work for him, constantly telling them that he could see their 'potential' and promising that he could help them make money. And, as seen in his message to

---

[8] The government notes that this conduct, occurring in Maryland, constitutes Sex Trafficking of a Minor, in violation of 18 U.S.C. § 1591(a)(1) and (b)(2), and carries with it a separate 10-year mandatory minimum sentence. The statute does not require that the defendant knew the minor was under eighteen years of age; the statute may be violated if the defendant recklessly disregarded the minor's age or if he had a 'reasonable opportunity' to observe her.

11

O.H., the defendant believed that he was entitled to sex from the women working for him. Moreover, there is significant evidence that the defendant used violence as a means to enforce his will, based on both J.C.'s statements to law enforcement and the defendant's own messages.

Given the extent and nature of the defendant's conduct, his offenses warrant a sentence at the high end of the Guidelines.

      B.      History and Characteristics of the Defendant

The present case is not the defendant's first interaction with the criminal justice system: he has prior convictions for Carrying a Pistol Without a License in 2006 and Possession of Marijuana in 2008. Moreover, unlike many individuals who come before this Court, the defendant has a supportive family, positive upbringing, and a college education. Despite these advantages, he chose to profit off the sexual exploitation of women. He boasted about his behavior over social media and has not voiced any remorse during the presentence report investigation, instead claiming that he supports himself through a "power-washing business" – despite the fact that he has not filed any income taxes and law enforcement found no evidence of this 'business' during a search of the defendant's residence, phones, and social media accounts.

The defendant does not stand before the Court due to a lapse in judgement or a mistake. Instead, he chose to engage in a course of criminal conduct over multiple years that exploited and endangered women. As a result, a sentence at the top of the Guidelines is appropriate.

      C.      Punishment, Deterrence, Protection, and Correction

The sentence imposed must reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence; and protect the public from further crimes of the defendant. The government's recommendation of 24 months of imprisonment and ten years of supervised release serves each of these goals. First, a sentence of incarceration reflects

the severity of the defendant's offense and the harm he caused multiple women. Second, a sentence of incarceration is needed in order to deter the criminal conduct of others who might see fit to profit off of the sexual exploitation of vulnerable women. Third, the lengthy period of supervised release ensures that the defendant will continue to be monitored once he is released – and thus discouraged from re-engaging in the offense conduct.

    D.    <u>Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities</u>

Section 3553(a)(6) requires courts to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records who have been found guilty of similar conduct." However, it "does not require the district court to avoid sentencing disparities between [ ]defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010). Here, the U.S. Sentencing Commission's Judicial Sentencing Information for Fiscal Years 2019—2023 shows that the average sentence length for individuals sentenced under U.S.S.G. § 2G1.1, with a final offense level of 15 and Criminal History Category I, was 30 months and the median sentence length was 18 months.[9] The government's recommended sentence falls within the average and median sentences and thus does not represent an unwarranted disparity.

    E.    <u>Restitution</u>

The government is not requesting restitution at this time.

## CONCLUSION

For the foregoing reasons, the government respectfully recommends that the defendant be sentenced to a term of incarceration of 24 months, followed by ten years of supervised release.

---

[9] Only six defendants met this criteria.

Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. Section 3553(a).

        Respectfully submitted,

        JEANINE FERRIS PIRRO
        United States Attorney

        */s/ Caroline Burrell*
        Caroline Burrell
        CA Bar No. 283687
        Assistant United States Attorney
        601 D. St N.W.
        Washington, D.C. 20530
        (202) 252-6950
        caroline.burrell@usdoj.gov